STATE, BY J. A. A. BURNQUIST, ATTORNEY GENERAL, v.
CLARENCE FISCHER AND OTHERS.[1]

May 20, 1955.

No. 36,536.

[1]Reported in 71 N. W. (2d) 161.

2

*Leland A. Olson,* for appellants.

*Miles W. Lord,* Attorney General, *John H. Burwell* and *Melvin J. Peterson,* Assistant Attorneys General, and *Gorden S. Lundberg,* Special Assistant Attorney General, for respondent.

CHRISTIANSON, JUSTICE.

Action is brought by the state of Minnesota against defendants who own lands over which the state seeks to establish a flowage

easement appurtenant to an existing dam under M. S. A. 110.31, *et seq*. The trial court found that defendants or their predecessors in interest had dedicated a perpetual flowage easement over the lands in question[2] for all overflow and other effects of water thereon resulting from the existence, maintenance, and operation of the dam at a crest elevation of 1065.40.

Defendants own lands bordering on Harden Lake and Hoff Lake in Meeker county, Minnesota, or on connecting waters in Meeker and McLeod counties.[3] Harden Lake is located to the north of Hoff Lake and is included in the 14½-square-mile watershed of Hoff Lake. Water moves from Harden Lake to Hoff Lake by way of a natural connecting flowage and then out of Hoff Lake through a natural outlet on the south side of the lake. The dam in question is located at the mouth of this outlet. It is a loose-rock dam and is about 40 feet wide.

Both Harden Lake and Hoff Lake are navigable public waters and have been used by the public for navigation, fishing, and hunting for

---

[2]The land is described in the trial court's findings as follows: "The S½ SE¼ and the S½ SW¼ of Section 25, and the NE¼ NW¼, NW¼ NE¼, W½ NW¼, and Government Lots 1, 2, 3, 4, 5, 6 and 7 of Section 36, all in Township 118 North, Range 31 West, Meeker County, Minnesota;

"Government Lots 1, 2, 3, 4, 5, 6 and 7, and the NE¼ SE¼ and SE¼ NE¼ of Section 1, Township 117 North, Range 31 West, Meeker County, Minnesota; and the SW¼ SW¼ of Section 30, and Government Lots 4 and 6, the SW¼ NW¼, SW¼ SW¼, NW¼ NW¼ of Section 31, all in Township 118 North, Range 30 West, Meeker County, Minnesota."

[3]Defendants' land is situated as follows: Clarence Fischer's land is on the north shore of Harden Lake, Emil Kohls's land is on the west shore of Harden Lake, and Anna Swanson and Axel Swanson have land on the east shore of Harden Lake. Ben Kohls owns land abutting both the south shore of Harden Lake and the north shore of Hoff Lake, and Henry Plath's land is situated on the natural flowage course between Harden and Hoff lakes. August Hoefs's land borders on a diversion channel which runs east from Harden Lake to Cedar Lake. The nine other defendants owning land adjacent to Harden or Hoff lakes who were served with summons in the proceedings failed to appear or answer therein and were adjudged in default. No jurisdiction was obtained over the village of Greenleaf. Only defendants Clarence Fischer, Anna Swanson, and Axel Swanson appeal from the trial court's order denying their motion for amended findings or a new trial.

more than 15 years prior to commencement of this action on April 29, 1952. Prior to 1920, the loose-rock dam which regulates the water level of Harden and Hoff lakes and connecting waters was constructed at the southern outlet of Hoff Lake. On July 24, 1953, the crest elevation[4] of the dam was established at a datum of 1065.40 based on a Cedar Lake diversion project bench mark, and according to the evidence produced, the elevation of the dam had not been raised since 1937. Except for an approximate six-by-eight foot break therein during the spring of 1939 which did not materially affect the water level of the lakes before being repaired, the dam has been in continuous operation since 1937. In years since 1937, the water level of Hoff Lake has decreased a maximum of six to twelve inches below its present level and the water level of Harden Lake has gone down as much as six inches from its present level. At the time when this action was commenced lands of several of the defendants which were tillable in 1937 had been rendered untillable by flooding resulting from the operation of the dam,[5] and the water level of the lakes has apparently been rising since 1942. Without giving any consideration to the private losses sustained by surrounding landowners, a drainage engineer employed by the division of waters in the state conservation department was of the opinion, after making an examination of the dam and lands affected thereby, that maintenance of the water levels of Harden and Hoff lakes and connecting waters by the con-

---

[4]The crest elevation of a loose-rock dam was defined by the engineer who testified for the state at the trial as that elevation at "which the water will flow around the rocks rather than over the top of it." The engineer also admitted that there could be seepage through the lower portion of the dam but that the extent thereof could not be determined.

[5]Axel Swanson has had 15 acres flooded since 1946 and Emil Kohls had 15 to 16 acres flooded at the time of trial. Ben Kohls has had 12 acres flooded since 1942 and it has been necessary for him to move back his fence along the north shore of Hoff Lake three times since 1942. Clarence Fischer had 40 acres of pasture and 35 acres of tillable land rendered unaccessible by flooding since 1941 which has necessitated the construction and maintenance of a road at his personal expense. However, it appears that this flooding was present in 1945 when Fischer purchased the parcel of land including the two inaccessible portions.

tinued existence, maintenance, and operation of the dam at its present crest elevation was necessary to the public interest in navigation, conservation of fish and waterfowl life, and public use of the lake.

█ Appellants contend that the evidence does not support a finding that defendants or their predecessors in interest had dedicated a perpetual flowage easement over their land adjoining Hoff and Harden lakes for all flowage resulting from the existence, maintenance, and operation of the dam at a crest elevation of 1065.40. To establish a common-law dedication, an intent on the part of the owner of the property to surrender or appropriate it to public use and an acceptance thereof by the public must be shown.[6] Finding an intent in a given case is a question of fact and such intent need not be express but may be implied from long uninterrupted public use of the property acquiesced in by the owner.[7] To disprove such intent, proof of acts of control and ownership over the property by the alleged dedicator or his grantees, about the time of the alleged dedication, is proper. Case v. Favier, 12 Minn. 48 (89).

█ M. S. A. 110.32 embodies a legislative determination that an intent to surrender their land to flowage resulting from maintenance of a dam at its then existing crest elevation is imputed to landowners abutting upon the lake where as required by § 110.31[8]

[6]Hurley v. City of West St. Paul, 83 Minn. 401, 407, 86 N. W. 427, 430; Jungels v. Schramel, 158 Minn. 93, 94, 197 N. W. 99, 100.

[7]Boye v. City of Albert Lea, 93 Minn. 121, 123, 100 N. W. 642, 643; Carpenter v. Gantzer, 164 Minn. 105, 109, 204 N. W. 550, 551; Anderson v. Birkeland, 229 Minn. 77, 83, 38 N. W. (2d) 215, 219.

[8]M. S. A. 110.31 provides: "The provisions of sections 110.31 to 110.39 shall apply in the case of any lake, including any connecting waters affected, being public waters of the state, where the following conditions now exist or shall hereafter exist:

"(1) A dam, however constructed or maintained, shall have existed in the outlet of the lake, affecting the water level thereof, for a continuous period of at least 15 years;

"(2) The lake shall have been used by the public for navigation, fishing, hunting, or other beneficial public purposes continuously throughout such period so far as permitted by natural conditions;

"(3) The use of the dam for any lawful purpose other than regulating, controlling, or maintaining the water level of the lake in aid of navigation,

the dam has existed and affected the water level of a lake for a continuous period of at least 15 years; the lake has been used for public purposes; the dam is used only to regulate the water level of the lake; and continued maintenance of the dam is in the public interest. Sections 110.31 and 110.32 do not supersede the common law regarding dedication of flowage easements but merely provide a minimum factual standard under which a common-law implied dedication will be presumed which is based on the rationale that acquiescence in public use is found in the failure of the abutting landowners to bring an action to abate the dam as a nuisance in view of the flowage damage resulting to their lands therefrom. Where § 110.32 applies the state is afforded a prima facie case which, absent evidence to the contrary,[9] will establish a perpetual flowage easement "for all overflow and other effects of water thereon resulting from the existence, maintenance, or operation of such dams during such period, * * * of like extent and effect as if the state had owned and controlled such dam and had thereby regulated, controlled, and maintained the water levels of the lake, * * * for the public use and benefit under the conditions existing from time to time during such period and had thereby acquired such easement for such purposes by prescription."

■ Although the requirements of § 110.31 are ostensibly satisfied in the instant case, the evidence discloses that several of the defendants tilled and thus exercised acts of private ownership and use of their now flooded land following commencement of the 15-year period in 1937 during which they were allegedly acquiescing in public use of their lands for flowage purposes. In fact, one of the appellants

propagation of fish or waterfowl, or other beneficial public purposes shall have been discontinued;

"(4) Continuance of the regulation, control or maintenance of the water levels of the lake as affected by the dam during said period would be desirable and in furtherance of the public interests in navigation, propagation of fish or waterfowl, or other beneficial public uses of the lake, and discontinuance thereof through deterioration or removal of the dam or otherwise would be detrimental to such public uses."

[9]The status of a presumption as a procedural device which merely provides the party in whose favor it operates with a prima facie case was settled by this court in TePoel v. Larson, 236 Minn. 482, 53 N. W. (2d) 468.

by building and attempting to maintain a road has consistently tried to make use of portions of his land which he has allegedly so dedicated.[10] Moreover, the water level of Hoff and Harden lakes which is regulated by the dam has apparently been rising since 1937[11] and, absent convincing evidence to the contrary, an inference may be drawn therefrom that it may not have presently reached its maximum level. Thus, while § 110.32 provides that the flowage easement shall be "of like extent and effect as if the state had owned and controlled such dam and had thereby regulated, controlled, and maintained the water levels of the lake, * * * for the public use and benefit under the conditions existing from time to time during such period and had thereby acquired such easement for such purposes by prescription," the finding of a flowage easement in the instant case to the extent of all overflow and the other effects of water resulting from maintenance of the dam at a crest elevation datum of 1065.40 exceeds that imposable under a claim of a prescriptive right wherein actual water levels and not the height of a dam determines the extent of an easement.[12] Furthermore, establishment of a flowage easement by implied dedication in the instant case without reference to the extent of actual overflow appears contrary to the legislative intent expressed in § 110.36 which empowers the commissioner of conservation to establish a high water level in excess of the natural high water level of a lake regulated by a dam under § 110.31 where the water levels of the dam "have established an ordinary high water level above the natural ordinary high water level of the waters affected" and limits the presumed dedication of the landowner to the actual water level so established. Although in the instant case, defendants could have brought an action to abate the dam immediately upon the flooding of any portion of their lands, we cannot say that the mere fact that

[10]See, note 5 and text thereto.

[11]This is shown by direct testimony and by the fact that up to the time of trial lands not flooded in 1937 were being rendered untillable. See, note 5 and text thereto.

[12]Taylor v. State, 302 N. Y. 177, 96 N. E. (2d) 765; 2 Farnham, Waters and Water Rights, § 560.

they failed to do so implies that they have acquiesced in all possible overflow and other effects of water resulting from maintenance of the dam at a crest elevation datum of 1065.40. Thus we find that the evidence of private use of the flooded lands since 1937 by several of the defendants and the increasing extent of the flooding due to the rising water levels of the lakes during the period since 1937 is clearly contrary to the proposition that appellants have acquiesced in public use of their lands for all overflow and other effects of water resulting from maintenance of the dam at a crest elevation datum of 1065.40. Therefore, while a dedication normally may arise "instanter" without regard to use for a specific period,[13] the presumption of a dedication under § 110.32 which is based upon acquiescence in public use during the 15-year period is adequately rebutted by such evidence of lack of acquiescence on the part of appellants during this period.

■ Furthermore, absent the presumption embodied in § 110.32, the findings of the trial court of a dedication by defendants may stand only if the state has sustained its burden of proving an intent to surrender or appropriate their lands to public use on the part of defendants.[14] In reviewing the findings of a trial court we must accept that evidence most favorable to the findings and may not reverse the findings of fact unless they are manifestly contrary to the evidence. Kiges v. City of St. Paul, 240 Minn. 522, 62 N. W. (2d) 363. The evidence in the instant case in support of the finding that defendants have dedicated an easement for all overflow and other effects. of water resulting from maintenance of the dam at a crest elevation datum of 1065.40 shows merely that the dam has existed since prior to 1920 and there has been no change in the height thereof during the past 15 years; that a certain amount of flooding has occurred on defendants' lands; and that the defendants have failed to bring an action to abate the dam for that flooding which has already occurred. However, the state has failed to show that the flooding of defendants' lands resulting from the dam has ever reached the maximum overflow attributable to the existing crest elevation of

[13]Carpenter v. Gantzer, 164 Minn. 105, 109, 204 N. W. 550, 551; Keiter v. Berge, 219 Minn. 374, 18 N. W. (2d) 35.

[14]See, notes 6 and 7.

the dam so as to constitute use of their lands for all overflow resulting from maintenance of the dam at a crest elevation datum of 1065.40 in which defendants could acquiesce. In fact the evidence of the increasing flooding since 1937 clearly indicates that the maximum amount of water which the dam could maintain may not yet be reached. Moreover, irrespective of evidence of actual flooding, the state has not shown that defendants have been made cognizant of the maximum possible use of their land for flowage resulting from maintenance of the dam at a crest elevation of 1065.40 by any other means. Since the extent of the perpetual flowage easement found by the trial court is predicated solely upon the crest elevation of the dam and it is not correlated to any actual use or claimed right to overflow defendants' lands known or knowable to defendants in which they could acquiesce, the finding of a common-law dedication on the part of defendants or their predecessors in interest for all overflow and other effects of water on their lands resulting from the existence, maintenance, and operation of the dam at a crest elevation of 1065.40 is manifestly contrary to the evidence.

It follows that the order denying appellants Clarence Fischer, Anna Swanson, and Axel Swanson's motion for amended findings or a new trial should be reversed with directions that judgment be entered in favor of appellants.

Reversed with directions.

## ON TAXATION OF COSTS.

On June 24, 1955, the following opinion was filed:

PER CURIAM.

Appeal from clerk's disallowance of taxation of costs and disbursements.

Appellants contend that the well-established rule that costs and disbursements cannot be taxed against the state in actions or proceedings brought by the state wherein the state acts in its sovereign capacity (State, by Peterson, v. Bentley, 224 Minn. 244, 247, 28 N. W. [2d] 179, 770) does not apply to this case. Cited as support for this claimed exception is Bingenheimer v. Diamond Iron Min. Co. 237 Minn. 332, 356, 54 N. W. (2d) 912, 925, where the state, in a land

10

registration proceeding, unsuccessfully claimed title to a lake bed and the iron ore lying thereunder. This court affirmed the clerk's taxation of costs against the state pointing out that there the state was acting in its proprietary and not in its sovereign capacity.

In the instant case, action was brought by the state to establish a flowage easement appurtenant to an existing dam under M. S. A. 110.31, *et seq.,* "for the use and benefit of the public." § 110.32. The action was brought in furtherance of the public interests in navigation and propagation of fish and waterfowl and was predicated on the theory of a dedication.

We find no merit in appellants' contention that the provisions of § 110.34, subds. 3 and 4, manifest a legislative intent that the general rule is inapplicable to actions brought by the state under § 110.31, *et seq.* The case of State, by Peterson, v. Bentley, 231 Minn. 531, 546, 45 N. W. (2d) 185, 194, is not in point since there, although the state was acting in its sovereign capacity in bringing condemnation proceedings, the statute authorizing the same specifically provided for the allowance of costs and disbursements to the prevailing party in the event of an appeal from an award of damages or from an omission to award damages. § 117.20(2).

The clerk's disallowance of taxation of costs and disbursements is affirmed .