A07A0270. POSTNIEKS et al. v. CHICK-FIL-A, INC. et al.
(647 SE2d 281)

BLACKBURN, Presiding Judge.

The trustees of two testamentary trusts filed this declaratory judgment action seeking to enjoin defendant Chick-fil-A's use of a curb cut and driveway located on property owned by the trusts and bordering property currently leased to Chick-fil-A. The trial court granted Chick-fil-A's motion for summary judgment, finding that Chick-fil-A had acquired an irrevocable license to use the curb cut and

driveway, and the trustees now appeal. We disagree that Chick-fil-A acquired an irrevocable license; however, because the trustees expressly dedicated the curb cut to public use, we affirm.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c); *Britt v. Kelly & Picerne, Inc.*[1] A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. *Matjoulis v. Integon Gen. Ins. Corp.*[2]

So construed, the evidence shows that the trusts own property located at the southeast corner of the intersection of Northside Parkway and West Paces Ferry Road in Atlanta. The property was purchased by the trustees' father from Charles Loridans in 1955 and shortly thereafter was developed into the West Paces Ferry Shopping Center. As part of that sale, the trustees' father conveyed to Loridans a 20-foot easement (Loridans easement) along the southern boundary of the property, which provided access from the remainder of Loridans's property to Northside Parkway.

Abutting the southern boundary of the property purchased by the trustees' father and also adjacent to Northside Parkway is property owned by Donald and Ivon Rolader. The Rolader property is bounded on the west by Northside Parkway and on the east and south by the remainder of the Loridans property. The property was previously leased to Union Oil Company, which operated a gas station on the site, but since 1994, the Rolader property has been leased to Chick-fil-A, which currently operates a free-standing Chick-fil-A fast-food restaurant there.

In 1976, the Loridans property to the east and south of the Rolader property was subleased to a developer, who at that time developed what is now known as the Parkway Place Shopping Center.[3] That same year, the developer subleased part of the Rolader property from the prime lessee (Union Oil) in order to create a driveway, which traversed that property and thus connected the Parkway Place Shopping Center to the Loridans easement. At this time, the developer also approached the trustees, who were now managing the trusts' property, and asked for their permission to create a curb cut-through ("curb cut") on the southern boundary of their property bordering the Loridans easement and north of the

---

[1] *Britt v. Kelly & Picerne, Inc.*, 258 Ga. App. 843 (575 SE2d 732) (2002).

[2] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

[3] The property is currently being subleased to JES Partners, which is a co-defendant in this matter and currently has its own motion for summary judgment pending before the trial court.

Rolader property to allow traffic to more easily flow between the two shopping centers. The trustees gave the developer their express permission, and the curb cut was created that day. Since the creation of the curb cut in 1976, public traffic has moved freely between the trustees' shopping center, the Parkway Place Shopping Center, and the Rolader/Chick-fil-A property.

Shortly after Chick-fil-A began leasing the Rolader property in 1994, a Chick-fil-A representative contacted one of the trustees to request permission to continue the use of the curb cut. The trustees never expressly responded negatively or affirmatively to Chick-fil-A's request. Despite not receiving the trustees' express approval, Chick-fil-A designed its restaurant's drive-through lanes in a manner which utilized the curb cut as a means of entry and exit; Chick-fil-A erected signs, re-paved the parking lot, and added pavement markings directing traffic flow. Chick-fil-A also began landscaping the area surrounding the curb cut and installed a storm-water drain at the northwest corner of its own property, which benefitted the trustees' property by reducing standing water in the area where the Loridans easement intersects with Northside Parkway. Additionally, shortly after it entered into its lease, Chick-fil-A entered into a reciprocal easement agreement with the lessees of the Parkway Place Shopping Center, which allowed for the free flow of pedestrian and vehicular traffic between the restaurant and the Parkway Place Shopping Center and also provided patrons of the latter with easier access to the trustees' shopping center.

From 1994 to 2002, pedestrian and vehicular traffic moved fairly freely from the Parkway Place Shopping Center, across the Chick-fil-A site, to the trustees' shopping center and vice versa. In late 2002, however, the trustees decided that traffic between Chick-fil-A and their shopping center needed to be controlled. Consequently, the trustees contacted Chick-fil-A and informed it that any further use of the curb cut on the trustees' property by Chick-fil-A customers would be considered trespassing unless Chick-fil-A agreed to pay a rental fee. When an agreement could not be reached, the trustees filed a petition for declaratory judgment and injunctive relief, seeking to prevent Chick-fil-A customers from using the curb cut. The parties filed cross-motions for summary judgment, and after a hearing, the trial court granted Chick-fil-A summary judgment, finding that it had acquired an irrevocable license to use the curb cut. This appeal followed.

1. The trustees contend that the trial court erred in granting Chick-fil-A summary judgment on the ground that it had acquired an irrevocable license to use the curb cut. Specifically, the trustees argue that they never granted Chick-fil-A an express license to use the curb cut.

OCGA § 44-9-4 provides that "[a] parol license to use another's land is revocable at any time if its revocation does no harm to the person to whom it has been granted. A parol license is not revocable when the licensee has acted pursuant thereto and in so doing has incurred expense; in such a case, it becomes an easement running with the land." *McCorkle v. Morgan*.[4] See *Blake v. RGL Assoc.*[5] The statute "is based on the principle that a license becomes an agreement for a valuable consideration, and the licensee a purchaser for value, where the enjoyment of the license must necessarily be *preceded* by the expenditure of money." (Emphasis in original.) *McCorkle*, supra, 268 Ga. at 731. However, under the statute, "[a] parol license is an express license." *Berolzheimer v. Taylor*.[6] Thus, "the statute is operative only where there is an express oral license." Id. See *Jordan v. Coalson*.[7] Here, although the trustees acquiesced to Chick-fil-A's use of the curb cut for over eight years, the fact that the trustees never provided Chick-fil-A with express oral permission to do so is undisputed.

Despite the undisputed factual evidence that the trustees never provided Chick-fil-A with an express oral license, Chick-fil-A argues that the trustees are bound by a legal conclusion stated in a trustees' interrogatory response that the trustees' silence and inaction with regard to Chick-fil-A's request to use the curb cut "in essence granted [Chick-fil-A] a revocable license." This conclusory remark fails to say that the license was express, but even if it did, legal conclusions in interrogatory responses — unlike legal conclusions in responses to requests to admit — are not binding judicial admissions on the party responding to the interrogatory. See *Wurlitzer Co. v. Watson*.[8]

Thus, given the fact that the trustees did not give Chick-fil-A express oral consent to use the curb cut, Chick-fil-A was not granted a parol license and, at most, had an implied license, to which OCGA § 44-9-4 does not apply. See *Berolzheimer*, supra, 230 Ga. at 600. Accordingly, the trial court erred in granting summary judgment to Chick-fil-A on the ground that it had acquired an irrevocable license under OCGA § 44-9-4.

2. Nevertheless, we affirm the grant of summary judgment because it was right for another reason argued by Chick-fil-A on summary judgment and on appeal. See *Theesfeld v. Image Electroly-*

---

[4] *McCorkle v. Morgan*, 268 Ga. 730, 731 (492 SE2d 891) (1997).

[5] *Blake v. RGL Assoc.*, 267 Ga. App. 709, 710 (1) (600 SE2d 765) (2004).

[6] *Berolzheimer v. Taylor*, 230 Ga. 595, 600 (198 SE2d 301) (1973).

[7] *Jordan v. Coalson*, 235 Ga. 326, 327 (219 SE2d 439) (1975).

[8] *Wurlitzer Co. v. Watson*, 207 Ga. App. 161, 165 (2) (427 SE2d 555) (1993).

*sis &c.*[9] See generally *City of Gainesville v. Dodd.*[10] Specifically, we agree with Chick-fil-A's contention that the curb cut on the trustees' property has been dedicated to public use and cannot now be revoked.

OCGA § 44-5-230, the statute relevant to public dedication, provides that

> [a]fter an owner dedicates land to public use either expressly or by his actions and the land is used by the public for such a length of time that accommodation of the public or private rights may be materially affected by interruption of the right to use such land, the owner may not afterwards appropriate the land to private purposes.

"The requirements for dedication to public use are (1) an intention of the owner to dedicate and (2) acceptance of the dedication by the public." (Citation and punctuation omitted.) *Cobb County v. Crew.*[11] "There is no particular form of making a dedication. It may be done in writing, or by parol; or it may be inferred from the owner's acts, or implied, in certain cases, from long use." (Punctuation omitted.) *Chatham Motorcycle Club v. Blount.*[12] "[T]o complete a dedication of land to a public use, there must be not only an offer to dedicate, but also an acceptance, either express or implied, by the appropriate public authorities *or by the general public.*" (Emphasis supplied.) *Smith v. Gwinnett County.*[13] See also *Smith v. State.*[14]

(a) *Express Offer of Dedication.* An express offer of dedication of land to public use may be completed by providing oral permission for such use. See *Chatham Motorcycle Club*, supra, 214 Ga. at 774 (1) (express dedication found where previous owners of plaintiff's property received oral permission from defendant's predecessors to widen road abutting their property); *City of Abbeville v. Jay*[15] (city's consent for land it owned to be used as a park constituted express dedication); *Haslerig v. Watson*[16] (express dedication found where previous owners of property gave oral permission for part of property to be used as a cemetery). "A grant is not necessary to create it." Id. at 679 (9). Furthermore, "[a]n express dedication of a particularly described

---

[9] *Theesfeld v. Image Electrolysis &c.*, 274 Ga. App. 38, 40 (2) (619 SE2d 303) (2005).
[10] *City of Gainesville v. Dodd*, 275 Ga. 834, 835 (573 SE2d 369) (2002).
[11] *Cobb County v. Crew*, 267 Ga. 525, 527 (1) (481 SE2d 806) (1997).
[12] *Chatham Motorcycle Club v. Blount*, 214 Ga. 770, 775 (1) (107 SE2d 806) (1959).
[13] *Smith v. Gwinnett County*, 248 Ga. 882, 885 (2) (b) (286 SE2d 739) (1982).
[14] *Smith v. State*, 248 Ga. 154, 158 (2) (282 SE2d 76) (1981).
[15] *City of Abbeville v. Jay*, 205 Ga. 743, 750 (3) (55 SE2d 129) (1949).
[16] *Haslerig v. Watson*, 205 Ga. 668, 679 (9) (54 SE2d 413) (1949).

parcel of land to a public use may be established by parol evidence."
*Ellis v. Mayor &c. of Hazelhurst.*[17]

Here, it is undisputed that the trustees gave express oral permission for the curb cut to be created on their property in 1976, and that they understood that it would be used by the public. For example, in an affidavit supporting their motion for summary judgment, one of the trustees swore that: "We were informed that [the developer] had been assigned the right to use the Loridan's Easement on our property, and *we had no problem with also giving him express permission to have his traffic access our property through the Goldberg alley as well.*" (Emphasis supplied.) Another of the trustees, while being deposed, was asked if she made no objection to the developer creating the curb cut on the trust's property and responded, "Correct. I gave [the developer] permission to do that." This trustee also conceded that as a result of the permission that was given, traffic flowed freely between the two shopping centers through the curb cut. She further acknowledged that "[a]nybody in the world has a right" to come onto the trust's property on which the curb cut was built because "[i]t's a public location." Accordingly, the trustees conveyed an express intent to dedicate the curb cut to public use.

The dissent asserts that the trustees' express oral permission allowing the developer to create the curb cut on their property did not demonstrate that the trustees intended to dedicate the curb cut to public use but only demonstrates that they granted a permissive use to a limited class of individuals. However, the dissent cites no case authority that would support this assertion; rather, the dissent appears to be drawing a semantic distinction without a difference. While the dissent cites cases, including several from other jurisdictions, which hold that continuous public use of an owner's property, and the owner's acquiescence to that use, do not necessarily indicate an intent of the owner to dedicate, none of those cases addressed an owner's express dedication of his property to public use, which is the key distinctive feature here. Indeed, all of the cases cited by the dissent involved allegations that the property owner's offer to dedicate was implied and the attempts to prove that implied dedication through evidence of public use. See *Lines v. State of Ga.*[18] ("The State and County admittedly introduced no evidence of any express offer of dedication. . . ."); *Thrash v. Wood*[19] (widow of previous owner of property testified that "[t]here was no road way through there which

---

[17] *Ellis v. Mayor &c. of Hazelhurst*, 138 Ga. 181, 184 (2)-(4) (75 SE 99) (1912).
[18] *Lines v. State of Ga.*, 245 Ga. 390, 393 (4) (264 SE2d 891) (1980).
[19] *Thrash v. Wood*, 215 Ga. 609, 611 (112 SE2d 578) (1960).

had been dedicated by [her husband]") (punctuation omitted); *Shapiro Bros. v. Jones-Festus Properties*[20] (only evidence of property owners' intent to dedicate was that property owners never blocked off access to parking lot); *Security Fed. S & L Assn. v. C & C Investments*[21] ("trial court did not make any findings that appellant expressly intended to dedicate [property] to the public use"); *Blank v. Park Lane Center*[22] ("[i]t is not contended that there was in this case a specific grant which is essential to express dedication"); *MDC Blackshear, LLC v. Littell*[23] (appellants claimed that property owner made implied dedication by designating alley as a boundary line on certain plats and deeds). In contrast, the trustees in this matter did not merely acquiesce to public use of their property but rather expressly allowed a public curb cut to be constructed on their property where no means of public ingress or egress had previously existed. Thus, we need not consider whether the trustees' actions constituted an implied dedication. Accordingly, the cases cited by the dissent are inapposite.

(b) *Implied Public Acceptance of the Dedication.* Our focus now turns to whether the public accepted the trustees' dedication. Acceptance by the public may be implied by the public's use of the property for a period of seven years or more. See *Smith,* supra, 248 Ga. at 885 (2) (b); *Smith,* supra, 248 Ga. at 158 (2); *Jergens v. Stanley;*[24] *Chatham Motorcycle Club,* supra, 214 Ga. at 774-775 (1). Furthermore, a finding of public acceptance is not precluded by the fact that a significant percentage of the public using the dedicated land are commercial patrons of the land owner's property. See *Lowry v. Rosenfeld*[25] (parking area in front of land owner's business and other retail shops found to have been dedicated to public use). Nor is a finding of public acceptance precluded by the fact that only a small number of the public actually use the dedicated land. See id.; *Haslerig,* supra, 205 Ga. at 683-684 (9) (cemetery used only by several hundred families found to have been dedicated to public use).

Moreover, although not specifically cited by the dissent, neither *Healey v. City of Atlanta*[26] nor *Tift v. Golden Hardware Co.*[27] support the dissent's attempt to undermine the proposition that public dedication can be accomplished despite only limited use of the property by

---

[20] *Shapiro Bros. v. Jones-Festus Properties,* 205 SW3d 270, 278 (Mo. App. 2006).

[21] *Security Fed. S & L Assn. v. C & C Investments,* 448 NW2d 83, 87 (Minn. App. 1989).

[22] *Blank v. Park Lane Center,* 121 A2d 846, 848 (Md. App. 1956).

[23] *MDC Blackshear, LLC v. Littell,* 273 Ga. 169, 170-171 (1) (537 SE2d 356) (2000).

[24] *Jergens v. Stanley,* 247 Ga. 543, 545 (277 SE2d 651) (1981).

[25] *Lowry v. Rosenfeld,* 213 Ga. 60, 64 (2) (96 SE2d 581) (1957).

[26] *Healey v. City of Atlanta,* 125 Ga. 736 (54 SE 749) (1906).

[27] *Tift v. Golden Hardware Co.,* 204 Ga. 654 (51 SE2d 435) (1949).

the public. In *Healey*, our Supreme Court held that use of one's property "by a small portion of the public" does not clearly indicate *an intent on the part of the owner* to dedicate his property to public use. *Healey*, supra, 125 Ga. at 738. The holding does not address whether the public has accepted an express dedication. Similarly in *Tift*, the Court found that the property owner's construction of a spur railroad track, which was only used by his own business, belied claims that he had ever intended a public dedication of his property. *Tift*, supra, 204 Ga. at 666 (4). Thus, in both cases the limited, or even nonexistent, use of the property by the public was addressed within the context of whether the owners' intent to make a public dedication could be implied in the absence of an express dedication and not within the context of whether there was an express or implied public acceptance of the dedication.

In this matter, it is undisputed that trustees allowed public traffic to freely use the curb cut for over 20 years, and that the public did so. Under these circumstances, where

> the owner of lands expressly dedicates the same to public use as a public road, acceptance by the public by public use is sufficient to complete the dedication without acceptance by the public authorities of the county; and where the land is so used for such a length of time that the public accommodation and private rights will be materially affected by an interruption of the enjoyment, the owner and those holding under him may not afterwards appropriate it to private purposes.

*Chatham Motorcycle Club*, supra, 214 Ga. at 774-775 (1). Accordingly, we affirm the grant of summary judgment in favor of Chick-fil-A.

*Judgment affirmed. Barnes, C. J., Andrews, P. J., Smith, P. J., Ruffin and Miller, JJ., concur. Bernes, J., dissents.*

BERNES, Judge, dissenting.

Because the evidence does not establish as a matter of law that the trustees dedicated the curb cut and driveway to public use, I respectfully dissent. "To prove a dedication of land to public use, there must be an offer, either express or implied, by the owner of the land and an acceptance, either express or implied, by the appropriate public authorities or by the general public." *Smith v. State*, 248 Ga. 154, 158 (2) (282 SE2d 76) (1981). See OCGA § 44-5-230. In this case, the evidence is insufficient to establish either an express or implied offer of dedication.

The majority opines that an express dedication to the public occurred in 1976 when the trustees granted the developer of the

adjoining shopping center permission to access the Loridans Easement by way of a curb cut.[28] In my view, the majority unduly expands the scope of the grant. Construed in the light most favorable to the nonmovant trustees, as we are obliged to do, the evidence shows merely that the trustees "granted a permissive use of the easement to the customers and invitees" of the adjoining commercial businesses, a limited class of individuals, in order to enhance access to the trustees' property.

That other members of the general public may have used the curb cut for convenience or as a short cut does not alter this conclusion. "It would be inequitable to impose a public easement on a[n] . . . owner's property because he tolerated liberties from the public which did not interfere with his private enjoyment." *Lines v. State*, 245 Ga. 390, 395 (5) (264 SE2d 891) (1980). See also *Thrash v. Wood*, 215 Ga. 609, 613-614 (1) (112 SE2d 578) (1960) ("a property owner who permits customer vehicular parking on his land in connection with the operation of his business should not be penalized by a taking of his property on the theory that he had made a dedication to the public where there was no intent on his part to do so . . ."). See also *Shapiro Bros. v. Jones-Festus Properties*, 205 SW3d 270, 277-278 (Mo. App. 2006) (property owner's acquiescence to fact that some members of the general public used parking lot of shopping establishment as a shortcut was insufficient to show an offer to dedicate); *Security Fed. S & L Assn. v. C & C Investments*, 448 NW2d 83, 87-89 (Minn. App. 1989) (property owner's inaction in response to fact that some persons who used curb cut and parking lot of shopping center complex were not customers or patrons, but instead were simply using the curb cut and parking lot as a cut through, was insufficient to demonstrate an offer to dedicate); *Blank v. Park Lane Center*, 121 A2d 846, 848 (Md. App. 1956) (fact that driveway in commercial area was used "by persons not desiring to shop or to park, but who intended to drive [through] as a matter of convenience or to avoid a traffic light" was insufficient to show offer to dedicate by property owner).

"Merely because [the trustees] did not put up a sign forbidding general public use, or did not adopt some wholly impractical method of trying to ascertain the purpose of any vehicle [using the curb cut], does not indicate an intention to dedicate." *Security Fed. S & L Assn.*, 448 NW2d at 88. See also *Shapiro Bros.*, 205 SW3d at 278

---

[28] This grant was explained by a trustee as follows: "[w]e were informed that Small[, the developer,] had been assigned the right to use the Loridan's Easement on our property and we had no problem with also giving him express permission to have his traffic access our property. . . . We believed that mutual access to and from the two shopping centers would be . . . mutually beneficial. . . ."

(owner should not have to "barricade or block entrances" to the general public in order to prevent a finding of an intent to dedicate).

We should not infer an intent to relinquish private property to the public simply because a business owner authorizes ingress and egress to his property for business purposes. "For why shall we infer that an individual makes a gift of his property to the public from an equivocal act, which equally proves an intention to grant a mere revocable license?" *Security Fed. S & L Assn.*, 448 NW2d at 88. The burden of proving a public dedication lies upon the party asserting it. *Lines*, 245 Ga. at 392 (1). "[T]he facts relied upon must be such as to clearly indicate a purpose on the part of the owner to abandon his personal dominion over the property and to devote it to a definite public use." (Punctuation and footnote omitted.) *MDC Blackshear, LLC v. Littell*, 273 Ga. 169, 170 (1) (537 SE2d 356) (2000). That standard was not met here.

Accordingly, I disagree with the majority's conclusion that there has been an express public dedication and implied acceptance by the general public. Since the evidence fails to reflect that there was an express or implied dedication in the first instance, it follows that there could be no implied public acceptance. The result reached by the majority calls into question the property rights of commercial businesses across this state that enter into agreements providing for the ingress and egress of customers and invitees. Likewise, the majority opinion has the result of potentially saddling public authorities with the upkeep and maintenance of large swaths of commercial property where commercial customers enter and exit.[29] See *Chatham Motorcycle Club v. Blount*, 214 Ga. 770, 773 (1) (107 SE2d 806) (1959); *Raines v. Petty*, 170 Ga. 53, 55 (1) (152 SE 44) (1930). Consequently, I dissent and thus would reverse the trial court's grant of summary judgment to Chick-fil-A and remand the case for further proceedings.

DECIDED MAY 10, 2007 —
RECONSIDERATION DENIED JUNE 7, 2007.

*Scheer, Jackson, Cohen & Schoenberg, Brant Jackson, Jr.*, for appellants.

---

[29] In this case, there is no evidence that any public authority has exercised dominion or maintenance over the curb cut at issue. The uncontroverted evidence establishes that the curb cut was maintained by Chick-fil-A.

*Schulten, Ward & Turner, Kevin L. Ward, Joseph L. Kelly, Hunton & Williams, Matthew J. Calvert, Ashley F. Cummings,* for appellees.